FIRST TRUST COMPANY OF LINCOLN, APPELLEE, v. AIREDALE RANCH & CATTLE COMPANY ET AL., APPELLANTS.

286 N. W. 766

FILED JULY 3, 1939. No. 30555.

522

*Neighbors & Coulter, Fred A. Wright* and *Woods, Aitken & Aitken,* for appellants.

*Harry R. Ankeny* and *Clinton J. Campbell, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, MESSMORE and JOHNSEN, JJ.

EBERLY, J.

This is an appeal from a judgment entered in behalf of plaintiff in a suit in equity for the collection of certain bonds, the foreclosure of the real estate mortgage securing the same, and the enforcement of a certain "agreement against ultimate loss" pertaining to the indebtedness evidenced thereby. From the adverse action of the trial court in adjudging them liable under the "terms" of the guaranty against ultimate loss, and overruling their respective motions for new trial, defendants appeal.

This is a continuation of *First Trust Co. v. Airedale Ranch & Cattle Co.,* 131 Neb. 475, 268 N. W. 362. It was therein stipulated by the parties, and ordered by the trial court, that the issues now for consideration be continued until after sale of the property was made and confirmation thereof had. These facts having occurred, the cause was tried with results as above indicated.

The original "agreement against ultimate loss" has been lost. There is no question as to the fact that such an instrument was originally executed and delivered by the defendants Robert L. Ferguson, W. H. Ferguson, T. L. Green, and C. N. Wright to the Lincoln Trust Company of Lincoln, Nebraska, in December, 1924. All parties agree that the following is a correct copy of the contractual parts of that agreement, land description, signatures, and one word only omitted, viz.:

"Agreement against ultimate loss.

"Know all men by these presents: That, whereas, the Airedale Ranch and Cattle Company has made application to the Lincoln Trust Company of Lincoln, Nebraska, for a loan of Seventy-five Thousand Dollars for five (5) years at six (6) per cent. per annum interest, payable semiannually, from * * * 1st, 1925, to be secured by a mortgage on Nine Thousand Two Hundred Eighty (9280) acres of land situated in Scotts Bluff county and Banner county, Nebraska, more particularly described as follows: * * * and whereas, the Lincoln Trust Company has agreed to make said loan, provided title is found satisfactory.

"Now, therefore, it is understood and agreed that, in consideration of the Lincoln Trust Company making said loan, the undersigned, C. N. Wright, T. L. Green, Robert L. Ferguson and W. H. Ferguson agree with the said trust company that in case it becomes necessary to foreclose said mortgage that the undersigned will pay all court costs and reasonable attorneys' fees incident to said foreclosure, and when the property secured by said mortgage is sold and a sheriff's deed issues, if it does not sell for a sufficient amount to pay said loan in full together with all interest according to the terms of the note and mortgage, then and in that case the undersigned will make up such deficiency, the intention being that the Lincoln Trust Company, its successors or assigns is to be held safe and harmless in the principal sum of Seventy-five Thousand Dollars ($75,-000) with interest according to the terms of said note and mortgage by reason of the making of said loan, hereby binding our heirs and assigns for the faithful performance of the conditions herein set out. Dated this December 22d, 1924."

The defendants contend that at the time they executed the original agreement against ultimate loss, the first omission in the foregoing quotation was occupied by the word "March;" that after delivery the trust company without authority changed the word "March" to "Jany;" that such change was a material alteration and avoided the agree-

ment; and that under the agreement as executed by them they were under no obligation to satisfy the amount remaining unpaid in the present foreclosure proceeding, for the reason that they never executed the second guaranty, and even if liable on the original guaranty they were completely discharged from all liability thereon because of the extension of the maturity of the mortgage indebtedness to which such guaranty related, made, without their consent as individual guarantors, by the Lincoln Trust Company to the Airedale Ranch & Cattle Company.

The defendants challenge the legal capacity of plaintiff to maintain this action for the reason that the First Trust Company of Lincoln, Nebraska, has no interest under the guaranty agreement executed in December, 1924, and therefore is not the proper party plaintiff and has no right to maintain this action.

The original indebtedness engagement in suit in this action was evidenced by, viz.: (1) An agreement against ultimate loss; (2) ninety-one real estate first mortgage bonds bearing even date with and secured by the real estate mortgage foreclosed in this suit in equity. These bonds each provided for the payment of interest from January 1, 1925, "at six per cent. per annum, payable semiannually," and that upon default made in the performance of terms therein stipulated, at the option of the Lincoln Trust Company, the maturity thereof was accelerated; that all payments to be made on these bonds, whether principal or interest, shall be made to said Lincoln Trust Company; and also provides that, "If any default occurs in this bond, or in any of said bonds or in said mortgage, then the Lincoln Trust Company may, as trustee for the holder of this bond and of all of said bonds, without notice to, or hindrance from any one, declare this bond and all of said bonds matured, due and payable;" (3) also, the real estate mortgage of even date with such bonds executed by the Airedale Ranch & Cattle Company to the Lincoln Trust Company of Lincoln, Nebraska, and securing the payment of the same, which in addition contained the following agreement, viz.: "In case of any of the

bonds or coupons secured hereby are held by other parties than the mortgagee, the parties hereto constitute and authorize the Lincoln Trust Company of Lincoln, Nebraska, as trustee under this mortgage, for the use and benefit of the holders of the debts secured hereby, with full power and authority upon maturity of this mortgage or the debts secured thereby, either by the lapse of time or by failure to perform any of the terms or conditions hereof, to foreclose or enforce collection or payment of this mortgage and the debts secured thereby, * * * to satisfy and release of record or otherwise this mortgage or said debts; to make distribution of the proceeds thereof to the holders or owners of said bonds or coupons after payment of the costs and expenses thereof, and to do all things necessary or suitable to the performance of said duties and the exercise of said powers." These three separate parts made and together as an entirety constituted a single contract. In the instant case neither the Lincoln Trust Company nor the First Trust Company, its successor-trustee, are owners or holders of any of the bonds secured by this mortgage.

The substance of the issue now before us was presented to this court in *First Trust Co. v. Eastridge Club*, 134 Neb. 785, 279 N. W. 720. The language of that opinion is quite applicable to the situation in the instant case, viz.:

"In cases such as here presented, sound policy would appear to require the highest effort to discover and effectuate the intention of the parties involved at the time of the execution of the instrument in suit. For this purpose this court has said: 'It is proper to look into other papers constituting parts of the same transaction and to consider the nature and course of the business between the parties.' *Rice v. McCague*, 61 Neb. 861, 867, 86 N. W. 486. See, also *Tootle v. Elgutter*, 14 Neb. 158, 15 N. W. 228.

"So, also, where the contract of guaranty is executed contemporaneously with, and as a part of, the consideration of the contract guaranteed, the law imputes notice to all parties immediately related to the transaction of its character and extent. This principle is certainly applicable here

in view of the identity of interest between the guarantors and the Eastridge Club. *Wright v. Griffith,* 121 Ind. 478, 23 N. E. 281.

"The view above set forth is quite in harmony with the general rule that a note, a mortgage securing the same, and a guaranty relating thereto, being executed substantially contemporaneously as one transaction, are to be construed together. 28 C. J. 918; *Charlestown Five Cents Savings Bank v. Zeff,* 275 Mass. 408, 176 N. E. 191; *Baker v. James,* 280 Mass. 43, 181 N. E. 861; *Skilton v. R. H. Long Cadillac LaSalle Co.,* 265 Mass. 595, 164 N. E. 652; *Luikart v. Massachusetts Bonding and Ins. Co.,* 129 Neb. 771, 263 N. W. 124.

"In the instant case, the assignment of the 'first mortgage real estate bonds,' evidencing the debt secured, by necessary implication, carried with it to the assignee the real estate mortgage by which they were secured, and also the guaranty assuring the payment thereof.

"Nor do we find the guaranty in suit 'special' in the sense contended for by appellants. Considered as an entirety, in connection with the bonds and mortgage evidencing the indebtedness referred to therein, and the purpose to be accomplished thereby as established by the surrounding circumstances, the guaranty is unrestricted as to right of transfer, and though running to the Lincoln Safe Deposit Company it is equally available to the assignee of the principal contracts and enforceable by him, or by the trustee who is his legal representative in the present suit. See, *Stillman v. Northrup,* 109 N. Y. 473, 17 N. E. 379; *Abraham Lincoln Life Ins. Co. v. Reynolds Mortgage Co.,* 30 Fed. (2d) 790; *Everson v. Gere,* 122 N. Y. 290, 25 N. E. 492; *First Nat. Bank v. Taylor,* 38 Utah, 516, 114 Pac. 529; *McGowan v. Wells' Trustee,* 184 Ky. 772, 213 S. W. 573."

It is axiomatic that equity will not allow a trust to fail for want of a trustee. The transaction as established by the three instruments referred to clearly evidenced the creation of a trust. The Lincoln Trust Company, the original trustee, and the First Trust Company of Lincoln, Nebraska, plaintiff

in this case, as successor-trustee, were corporations organized and doing business under the provisions of sections 8-201 to 8-221, inclusive, Comp. St. 1929, and were thereby specifically endowed with power "To accept and execute all such trusts as may be committed to them by any corporation, person, or persons, and to act as * * * trustee * * * and to accept and execute all such trusts as may be committed or referred to them by order, judgment or decree of any court of record;" and in addition were each vested with ample legal capacity "To perform all acts and exercise all powers connected with, belonging to or incident to, or necessary for the full and complete exercise and discharge of the rights, powers and responsibilities * * * (thus) granted, and all provisions of this article shall be liberally construed." Comp. St. 1929, sec. 8-206.

It follows that under the proceedings had in this case, when the legal capacity of the Lincoln Trust Company to discharge the duties imposed by this trust had terminated through its bankruptcy and proceedings incidental thereto, the First Trust Company of Lincoln legally succeeded to and possessed all and identical powers originally vested in and possessed by the Lincoln Trust Company, and thus was a proper party plaintiff with ample right to maintain this action.

Preliminary to a consideration of the remaining defenses tendered in behalf of C. N. Wright, T. L. Green, Robert L. Ferguson and W. H. Ferguson, who executed the first "agreement against ultimate loss" in suit, it will be noted that they were business associates in the operation of the ranch which is referred to in the record as the Airedale Ranch. This ranch embraced 9,280 acres of land situated in Scotts Bluff and Banner counties, Nebraska. Wright lived in Scottsbluff and occupied himself more with the outside affairs looking after the stock and welfare of the ranch. T. L. Green was in the ranch office at Scottsbluff. Mr. W. H. Ferguson attended to the financing. Robert L. Ferguson is the son of W. H. Ferguson, and was the principal representative of all interests concerned in the nego-

tiating of the original $75,000 loan in 1924, and of the renewal thereof in 1930. This ranch business was carried on under corporate forms. It was incorporated on May 11, 1916, as the Airedale Ranch & Cattle Company. In December, 1924, Green, Wright, and W. H. Ferguson owned the controlling stock. Robert L. Ferguson became a stockholder therein July 31, 1925. Green, Wright and W. H. Ferguson were directors in 1924. Robert L. Ferguson became a director in June, 1925. Wright, Green, W. H. Ferguson and Robert L. Ferguson were continued as directors and executive officers of this corporation until after the date of the extension of the maturity of the mortgage on the company's real estate December 20, 1929. W. H. Ferguson was president of, and appears to have had executive control over, Ferguson & Company, a corporation which is mentioned in the evidence in this case, and was at all times, until the bankruptcy of the Lincoln Trust Company in 1932, a stockholder and director therein. Robert L. Ferguson was likewise a director of the Lincoln Trust Company, the exact time of his continuance in that position is not disclosed, but he served on the executive committee from January, 1928, to the date of its bankruptcy in 1932. However, in corporate action pertaining to the matters here in suit, the two Fergusons did not in any manner participate as directors of and for the Lincoln Trust Company or in its behalf, though subject to the presumption as to knowledge which their office implied. *Merchants Bank v. Rudolf*, 5 Neb. 527; *Kienke v. Hudson*, 126 Neb. 551, 253 N. W. 687.

We are now to determine the liability of the defendants in view of the nature of the remedy sought, their relation to each other and to the subject of the action, and the inherent nature of the contractual obligation they have assumed by the terms of the "agreement against ultimate loss."

First, it may be said that because of the facts hereinbefore set forth the signers of this "agreement against ultimate loss" have such a beneficial interest therein, and in the corporation sought to be benefited thereby, as to deprive

them of the status of "favorites of the law" in the ordinary sense of guaranty or surety. They were real beneficiaries of the loan to which this contract relates. The corporation was their own artificial creation, organized for their own profit. *Valley Nat. Bank v. Cownie,* 164 Ia. 421, 145 N. W. 904.

In the interpretation of this contractual agreement by these defendants, it being strictly one of indemnity, the following principles of construction are applicable, viz.:

"The general rules which govern the construction and interpretation of other contracts apply in construing a contract of indemnity and in determining the rights and liabilities of the parties thereunder. In accordance with such rules the important question for determination is the intention of the parties, and the contract should be so construed, if it can be done consistently with legal principles, as to ascertain and give effect to such intention; and in making such construction the terms used and the language employed in the contract must be given a fair and reasonable interpretation, the contract must be read in its entirety, and consideration must be given not only to the language of the contract but also to the situation of the parties and the circumstances surrounding them at the time the contract was made. Other general rules of construction which apply are: That the contemporaneous understanding and the construction which the parties have put upon the contract, as shown by their correspondence or otherwise, should be considered; that the interpretation must be made with reference to the known customs of trade, which constitute a part of the contract." 31 C. J. 426.

See, also, *Title Guaranty & Surety Co. v. Roehm,* 215 Mich. 586, 184 N. W. 414; *Moriarty v. Tomlinson,* 58 S. Dak. 431, 235 N. W. 363; Restatement, Contracts, secs. 243, 244.

In this connection it has been held that a covenant of indemnity cannot, when clear in its terms, be restricted by a recital. *Parker v. Read,* 9 N. H. 121; *In re Baker,* 20 Ch. D. (Eng.) 230.

So, also, the rule has been announced, viz.: "If the re-

citals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred." *Ex parte Dawes,* 17 Q. B. D. (Eng.) 275, 286, quoted with approval in *Williams v. Barkley,* 165 N. Y. 48, 58 N. E. 765.

A careful consideration of the terms of the "agreement against ultimate loss" leads to the conclusion that it is a direct and original undertaking of the makers thereof to and with the Lincoln Trust Company as trustee, and is wholly one of indemnity, in which the signatories thereto undertake to save the indemnitee against loss arising from the contingent event therein stated. We are confirmed in this view by the principle of construction announced by Pound, C., in *Northern Assurance Co. v. Borgelt,* 67 Neb. 282, 93 N. W. 226, viz.: "Courts incline strongly to construe bonds as contracts of indemnity only, and will attach more importance to the general purpose of a bond, as shown by its provisions as a whole and the interests of the parties in the subject-matter, than to the precise form of words employed."

In *Moore v. Capital Nat. Bank of Lansing,* 274 Mich. 56, 264 N. W. 288, in the discussion of a situation analogous to the one presented in the instant case, the following language is employed, viz.:

"While the indemnitors were referred to as 'guarantors' in the agreement and did 'guarantee' the Capital National Bank against loss, the purport of the agreement was wholly one of indemnity, notwithstanding the fact that appellants are referred to as 'guarantors' in the agreements. The contract was an original and not a collateral agreement, and differs from a contract of guaranty or suretyship. The contract of guaranty or suretyship requires three parties, the principal, the obligee, and the guarantor or surety. One of indemnity requires two parties, the indemnitor and the indemnitee. The indemnitor undertakes to save the indemnitee

against loss arising from an unknown or contingent event. The contract of indemnity is one of insurance. A contract of guaranty is a form of suretyship. See Stearns, Law of Surety (4th ed.) footnote, p. 37; *Hall v. Woodin,* 35 Mich. 67. In the instant case the 'guarantors' were not to answer for the payment of a debt of another, but were to indemnify the Capital National Bank for any loss in connection with the performance of the contract."

In 31 C. J. 419, it is stated, viz.:

"The promise in an indemnity contract is an original and not a collateral undertaking, and in this particular differs from a contract of guaranty. If the contract of indemnity refers to, and is founded upon, another contract, either existing or anticipated, it covenants to protect the promisee from some accrued or anticipated liability, arising upon such other contract; it is not a contract to answer for the contractual debt, default, or miscarriage of another than the promisee, but a contract to indemnify the promisee from loss owing to his contractual liability. It is given to a person against his sustaining loss or damage, and cannot properly be called one that insures the thing."

See, also, *Eckhart v. Heier,* 37 S. Dak. 382, 158 N. W. 403; *In re Prunty's Estate,* 201 Ia. 670, 207 N. W. 785; *Westville Land Co. v. Handle,* 112 N. J. Law, 447, 171 Atl. 520.

In the determination of the proper application of the foregoing principles of law, we must include a consideration of the situation of the parties and the circumstances surrounding them when the contract was made. The lands embraced in the Airedale Ranch had been mortgaged to secure an indebtedness of $75,000 which matured January 1, 1925. To provide for this situation, in the fall of 1924, Robert L. Ferguson, representing the interests involved, carried on negotiations with the Lincoln Trust Company. The control of the business of this corporation was vested in the board of directors thereof. Comp. St. 1929, sec. 8-204. Throughout their negotiations, as a prerequisite to accepting the application thus made, was the requirement that the loan, if made, should be covered by the stock form of "agreement

against ultimate loss" which was then employed by the trust company. Finally, on this basis, the application for the loan was approved by the trust company. Its clerical help then prepared an "agreement against ultimate loss," ninety-one bonds with interest coupons attached evidencing the interest to accrue thereon "from January 1, 1925," and the real estate mortgage securing the same. These instruments were forwarded to Scottsbluff where, pursuant to authority of a resolution adopted by the stockholders of the Airedale Ranch & Cattle Company, C. N. Wright and T. L. Green, as president and secretary, respectively, on December 24, 1924, executed the real estate mortgage, together with the bonds and interest coupons secured thereby. This real estate mortgage was duly filed for record in Banner county, Nebraska, on December 26, 1924. C. N. Wright and T. L. Green, at Scottsbluff, also executed the "agreement against ultimate loss." The writing so signed was forwarded to Robert L. Ferguson, who, after the same had been signed by his father and himself, delivered the same to the trust company. There is also in the record an original letter, bearing date of December 29, 1924, directed to the president of the Lincoln Trust Company, signed by the secretary of the Airedale Ranch & Cattle Company, from which we quote, viz.:

"Enclosed I hand you copy of resolution authorizing procuring of new real estate loan by officers of Airedale Ranch & Cattle Company.

"Yesterday I forwarded to Robert L. Ferguson supplemental abstract covering all of the Airedale lands in Banner county, and have today sent him the abstract to the 40 acres in Scotts Bluff county, and asked that he deliver same to you. We also sent him the guarantee of the loan which was signed by us."

These instruments, so delivered, were accepted by the corporate authorities of the Lincoln Trust Company as in complete compliance with their requirements, and on December 31, 1924, the sum of $77,250 was remitted to the holder of the old mortgage thus retired.

Twelve or thirteen years after this transaction the makers of the "agreement against ultimate loss" testify that now for the first time they have discovered that the recital of this instrument in reference to the obligation to which it related, as originally executed by them, was "for a loan of seventy-five thousand dollars for five years with interest at six per cent. per annum from March 1, 1925." The correctness of the bonds and mortgage they executed in 1924 is unchallenged. The only matter possibly involved is the interest accruing on the loan for the months of January and February, 1925, which was fully paid and discharged more than twelve years ago, and after which the principal of the original obligation had been renewed for the period of five additional years by the same persons who executed the instrument now in suit. The original requirement of the ultimate loss contract, as made by the Lincoln Trust Company, is now not denied by them. Nevertheless, the claim at this time is that the mortgage and notes referred to therein were not properly described in their "guaranty" and therefore no liability followed the execution thereof by the "guarantors." In addition, it is claimed that the trust company, without authority, altered the original agreement by substituting January for the word "March," and such alteration operated to annul the agreement. However, it is not charged that the alteration, if made, was fraudulently done; and the evidence amply sustains the conclusions that, if the alteration was made, it was done in good faith to conform the "agreement against ultimate loss" to the actual contract of the parties, and made by an executive assistant of whose act it is not claimed that the board of directors had any knowledge whatever.

Obviously, when the three instruments, the "agreement against ultimate loss," the real estate mortgage, and the coupon bonds evidencing the loan secured, were substantially at the same time presented to and laid upon the table of the trust company in December, 1924, such instruments must be deemed by the parties to the transaction to effect a definite and legal purpose and to evidence a certain valid

obligation assumed. Delivery of these instruments substantially contemporaneously was an essential element in their completion and marks the date of their effectiveness. 13 C. J. 307. We would certainly hesitate to imply that any one concerned in the transaction then intended the delivery of an invalid instrument. True, if the "agreement against ultimate loss" had been carefully compared, the discrepancy in the recital as to the commencement of the interest would have been noted, but the covenant against ultimate loss, the "operative part," is clear, definite and certain, and as the three instruments lay on that table, construed as one contract, the real intent of all parties is certain beyond reasonable doubt, and the "operative part" must prevail. This discrepancy, wholly due to a recital at variance with the unquestioned facts fully disclosed by the terms of the contract considered as an entirety, must be deemed immaterial. Not having the original agreement against ultimate loss at hand, in view of the evidence as an entirety, we find it unnecessary to determine whether the original instrument was as a matter of fact actually altered to conform to the clear intent of the parties. An immaterial defect, by correction made in good faith, could hardly become a material alteration.

"If an instrument is changed in respect of the consideration, which appears only as a recital to show the basis of the instrument, it would seem to be immaterial. Where words are added which are merely descriptive of the consideration and so fail to alter the legal effect of the instrument, they are, of course, immaterial." 3 C. J. S. 947, sec. 32.

"An alteration of a written instrument after its execution by one party thereto, without the knowledge or consent of the other, which neither varies its meaning nor changes its legal effect, is an immaterial alteration, and will not invalidate the instrument." *Fisherdick v. Hutton,* 44 Neb. 122, 62 N. W. 488.

See, also, *Quinn v. Moss,* 45 Neb. 614, 63 N. W. 931; *Blenkiron Bros. v. Rogers,* 87 Neb. 716, 127 N. W. 1062.

But there is no evidence in the record that this alteration was fraudulently made, and no evidence that it was done by direction or authority, or with the knowledge, of the board of directors of the Lincoln Trust Company. The only affirmative evidence on the subject is not direct, but tends to show that the word "Jany," if in fact written in the original agreement against ultimate loss, was written therein by an employee occupying an executive position only.

In this country the more equitable rule prevails that alteration by strangers, or spoilation as it is frequently called, will not discharge an obligation, and for this purpose the obligor's agent who makes an unauthorized alteration is a stranger. Alteration by the obligee's agent or attorney also does not discharge the obligation if the obligee himself did not authorize it, and the same is true if the alteration was by a trustee. Restatement, Contracts, sec. 434, Illus. 3 and 4; *Clyde S. S. Co. v. Whaley,* 231 Fed. 76, 79, 145 C. C. A. 264; *Burgess & Co. v. Blake,* 128 Ala. 105, 28 So. 963; *Forbes v. Taylor,* 139 Ala. 286, 35 So. 855; *Langenberger v. Kroeger,* 48 Cal. 147; *Central California Creditors Ass'n v. Seeley,* 91 Cal. App. 327, 267 Pac. 138; *Brooks v. Allen,* 62 Ind. 401; *Shenkberg Co. v. Porter,* 137 Ia. 245, 114 N. W. 890; *Vanderford v. Farmers & Mechanics Nat. Bank,* 105 Md. 164, 66 Atl. 47; *Broadway Nat. Bank v. Heffernan,* 220 Mass. 247, 107 N. E. 921; *White Sewing Machine Co. v. Dakin,* 86 Mich. 581, 49 N. W. 583; *Owosso Sugar Co. v. Arntz,* 244 Mich. 351, 221 N. W. 179; *Hunt v. Gray,* 35 N. J. Law, 227; *Martin v. Tradesmen's Ins. Co.,* 101 N. Y. 498, 5 N. E. 338, n.4; *Gleason v. Hamilton,* 64 Hun, 96, 19 N. Y. Supp. 103; *Waldorf v. Simpson,* 15 App. Div. 297, 44 N. Y. Supp. 921; *Fullerton v. Sturges,* 4 Ohio St. 529; *Acme Harvester Co. v. Butterfield,* 12 S. Dak. 91, 80 N. W. 170; *Port Huron Engine & Thresher Co. v. Sherman,* 14 S. Dak. 461, 85 N. W. 1008; *Deering Harvester Co. v. White,* 110 Tenn. 132, 72 S. W. 962; *Griffin v. Shamburger,* 262 S. W. (Tex. Civ. App.) 144; *Flinn v. Brown,* 6 S. Car. 209.

It is stated in *Barton Savings Bank & Trust Co. v.*

*Stephenson,* 87 Vt. 433, 89 Atl. 639, viz.: "There is a class of cases where a note is procured by an agent, delivery to whom is delivery to the payee, but whose subsequent authority is limited to the custody and transmission of the writing; and alterations made by these persons are treated as the acts of a stranger. In this class are *Bigelow v. Stilphen,* 35 Vt. 521; *Equitable Mfg. Co. v. Allen,* 76 Vt. 22, 56 Atl. 87."

It will be noted that in the instant case recovery against the guarantors is sustainable on the instrument as they originally made it, and is in no manner affected by the alteration which it is claimed was made. The conclusion is that the legal rights and obligations evidenced by the "agreement against ultimate loss" are in no substantial manner varied or impaired, when tested in an action where the beneficiaries of the trust, the bond holders, are the ultimate parties in interest.

It is to be noted that the plaintiff has alleged and introduced evidence tending to establish that, when this loan was, by agreement of the parties, extended at its maturity for a period of five years, a second "agreement against ultimate loss," in the same standardized form in which the first agreement of that nature was cast, was executed and given by Robert L. Ferguson, W. H. Ferguson, T. L. Green, and C. N. Wright, in December, 1929, and delivered to the Lincoln Trust Company as part of the contract of extension. Both oral and record proof is tendered in support of plaintiff's pleading. Evidence on the part of the defendants necessarily contradicts that upon which plaintiff relies to sustain its contention. Upon this state of proof, the trial court that heard defendants' evidence found "that as a part of the transaction and consideration for extending the maturity date of the original loan so made by Lincoln Trust Company to Airedale Ranch & Cattle Company from January 1, 1930, to January 1, 1935, there was delivered to Lincoln Trust Company on or about December 30, 1929, a second agreement against ultimate loss which had been executed by the defendants, C. N. Wright, T. L. Green,

Robert L. Ferguson and said W. H. Ferguson, deceased, and that the conditions thereof were the same as the conditions of said original agreement against loss, a copy of which was admitted in evidence, except as to the date said bond indebtedness became due."

This is an appeal in equity, and is here for trial *de novo*, and it is the duty of this court to reach an independent conclusion without reference to the findings of the district court. Comp. St. 1929 sec. 20-1925. But when the evidence on material issues so conflicts that it cannot be reconciled, the court considers the fact that the trial court observed the witnesses and their testimony, and must have accepted one version of the facts rather than the opposite.

Of the four alleged signers of the second "agreement against ultimate loss," defendant Green, though present in court, did not testify on this subject. Defendant William H. Ferguson was ill, but testified by deposition, and had no recollection of the transaction involving the extension of the loan in 1929. Mr. Wright, when questioned about the extension of this mortgage in December, 1929, testified that he did not recall the signing of the extension of the mortgage, and that he took no part in negotiating the extension. Robert L. Ferguson denied that any such second agreement against ultimate loss was ever entered into or given in connection with the extension of the real estate mortgage in December, 1929. So, it will be seen that but one of the alleged makers of this second agreement against ultimate loss expressly and positively denied its execution and delivery. It must be conceded that he is strictly a party in interest. Under similar circumstances, Redick, District Judge, in the opinion adopted by this court in *Dvorak v. Kucera*, 130 Neb. 341, 264 N. W. 737, made the following observations, viz.:

"It is extremely difficult for a reviewing court to arrive at a satisfactory conclusion when the testimony is in conflict and the principal fact to be determined rests upon the evidence of interested witnesses. In such case the judgment of the trial court who had the benefit of seeing the

witnesses and observing their deportment while testifying is of considerable weight, notwithstanding the requirement of the statute that the reviewing court shall try the case *de novo.*"

In the instant case we have to consider the testimony of one uncorroborated witness as to a transaction occurring some six or seven years prior to his examination before the trial court. Under the circumstances delineated in this record, on trial *de novo* we do not feel justified in departing from the conclusions of the trial court on the subject now under consideration.

But the testimony of defendants as to the negotiations that took place in 1929 is silent as to any reference therein to the admittedly then existing "agreement against ultimate loss" which had been executed by the four defendants in 1924. Under the circumstances outlined, the new "agreement against ultimate loss," in identical terms with the existing one and executed by the same parties, was not a superseding or replacement of the former obligation, but merely cumulative thereto. *Headley v. Post,* 120 Kan. 504, 243 Pac. 1042; *First Nat. Bank v. Story,* 131 App. Div. 472, 115 N. Y. Supp. 421. Had no new contract against ultimate loss been entered into, under the circumstances in this case the extension of the mortgage debt for a period of five years, in which each one of the makers participated, would not have operated to effect their release. This is strictly an indemnity contract and not a collateral obligation. The four original "guarantors" then constituted the principal stockholders and the control of the debtor corporation. As stockholders their votes adopted a resolution authorizing the making of the extension of the mortgage indebtedness by the corporation. They, as officers and directors, sought for this extension, and it was granted to them. It was for the benefit of their private interests that it was secured. They all, in their respective spheres, stockholders, directors and officers, cooperated in securing the extension. The extension affected their own property. Such as were officers joined as officers of the debtor corporation in executing the

necessary papers securing the renewal or extension of the real estate mortgage, and they at least made no stipulations or requests for release of the then original indemnifying agreement. They thereafter, through the corporate agency, paid interest on the extended obligation thus obtained. The effect of their acts was not thereby to secure their release from an obligation as to which they made no stipulations in the extension contract. 21 R. C. L. 1024, sec. 70. Thus, "Where the surety on a note of a corporation was the acting officer of the corporation, and executed and delivered the note originally, and paid interest in advance at the various times when the note was extended, he in legal effect, requested such extension, so that he was estopped to assert his discharge as surety because of lack of consent thereto." *Hallock v. Yankey,* 78 N. W. 156 (102 Wis. 41).

Finally, the defendants insist that the action on the "agreement against ultimate loss" was prematurely brought, and combining these causes of action with the foreclosure of the mortgage created a misjoinder. This, of course, was in turn based upon the proposition that, until the mortgaged premises had been sold and the amount of the deficiency determined, no present demands existed within the contemplation of the indemnity contract and the action must fail. *People's State Bank v. Smith,* 120 Neb. 29, 231 N. W. 141, and section 20-2143, Comp. St. 1929, are cited to sustain this contention. We cannot accept defendants' construction of the statutory provision. The weight of authority appears opposed to it. 19 Standard Ency. of Procedure, 942; *United States Trust Co. v. Miller,* 116 Neb. 25, 215 N. W. 462. *People's State Bank v. Smith, supra,* was an action at law. The present proceeding is clearly a suit in equity. The effect of this difference was well expressed by the New York court in *Russell Hardware & Implement Mfg. Co. v. Utica Drop Forge & Tool Co.,* 195 N. Y. 54, 87 N. E. 788, as follows: "Differing from the rule in actions on the law side of the court, which limits the judgment to the facts as they existed at the commencement of the action, when the action is in equity, relief will be

administered as the nature of the case and the facts, as they exist at the close of litigation; demand."

And it was said in the opinion in *Madison Avenue Baptist Church v. Baptist Church in Oliver Street,* 73 N. Y. 82, 95: "It is the practice of courts of equity, when they have once obtained jurisdiction of a case, to administer all the relief which the nature of the case and the facts demand, and to bring such relief down to the close of the litigation between the parties." See *Lynch v. Metropolitan Elevated Ry.,* 129 N. Y. 274, 29 N. E. 315; *Pond v. Harwood,* 139 N. Y. 111, 34 N. E. 768; *Sherman v. Foster,* 158 N. Y. 587, 53 N. E. 504.

To accede to the contention of the defendants in this matter would, in effect, abrogate the equitable maxim that " 'Equity delights to do justice, and that not by halves.' The significance of this maxim lies in its last words. It means that it is the aim of equity to have all interested parties in court and to render a complete decree adjusting all rights and protecting the parties against future litigation. The principle of the maxim embraces the well-established doctrine that when equity once acquires jurisdiction it will retain it so as to afford complete relief." 21 C. J. 198. See, also, *Rakow v. Tate,* 93 Neb. 198, 140 N. W. 162; *Shevalier v. Stephenson,* 92 Neb. 675, 139 N. W. 233; *Bell v. Dingwell,* 91 Neb. 699, 136 N. W. 1128; *Bank of Stockham v. Alter,* 61 Neb. 359, 85 N. W. 300.

"The provisions of codes and practice acts with reference to joinder of causes of action and counterclaims have not changed the rule with regard to retention of jurisdiction in equitable actions. * * * The court is not restricted to an adjustment of the rights of the parties as they existed when suit was brought, but will give relief appropriate to events occurring pending the suit." 21 C. J. 137. See, also, *Loosing v. Loosing,* 85 Neb. 66, 76, 122 N. W. 707.

It thus appears that the indemnitors in this case were proper, though not necessary, parties to the original foreclosure proceeding; that no misjoinder was created by making them such; and that the decree of the trial court in

adjusting and determining matters as of the date of the trial was not erroneous, and the same is, in all respects,

AFFIRMED.